MICHAEL P. MANGAN
MANGAN GINSBERG LLP
80 Maiden Lane, Fifth Floor
New York, New York 10038
Phone (212) 248-2170
Fax: (212) 248-2155
*Attorneys for Defendants Clos-ette Too, LLC*
*and Melanie Charlton Fascitelli*

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
CLAIRE ALLISON                                             14 CV 1618 (LAK) (JCF)

                                  Plaintiff,


              *-against-*


CLOS-ETTE TOO, LLC, CLOS-ETTE, LLC
and MELANIE CHARLTON FASCITELLI,

                                  Defendants,
-----------------------------------------------------------------------x

               MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
               <u>MOTION FOR SUMMARY JUDGMENT</u>

February 11, 2015

# TABLE OF CONTENTS

PAGE

I.   SUMMARY OF MOTION ................................................................................ 1

II.  STATEMENT OF PROCEDURAL HISTORY ......................................................... 1

III. STATEMENT OF FACTS ............................................................................... 3

IV.  ARGUMENT ............................................................................................... 6

   A. Standard of Review for Summary Judgment ................................................ 6

   B. Summary Judgment Appropriate for FLSA & NYLL Minimum Wage Claims...... 7

     (1) Plaintiff was a Member-Owner, Not an FLSA Employee .................................. 7

     (2) *Brock* Factors Demonstrate Plaintiff Was Not an Employee ........................... 9

        i.    Degree of Control C2 Exercised Over Plaintiff ........................................ 9

        ii.   Plaintiff's Opportunity for Profit or Loss and Investment in C2 ............... 10

        iii.  Plaintiff's Skill and Independent Initiative Required to Perform Work .... 12

        iv.   Permanence and Duration of Plaintiff's Working Relationship at C2....... 13

        v.    Extent to Which Plaintiff's Work was Integral Part of C2's Business ...... 14

     (3) Plaintiff Was an Equity-Member, Not an Employee ...................................... 15

     (4) Plaintiff Was an Independent Contractor, Not an Employee.............................. 16

     (5) Plaintiff Was an Owner and Independent Contractor Under the NYLL ............. 16

     (6) Plaintiff's Refusal to Provide Damage Computation Requires Dismissal .......... 17

   C. Summary Judgment Appropriate for Breach of Contract Claims............................ 18

     (1) There is No Enforceable Contract Entitling Plaintiff to Unpaid Salary ............. 20

     (2) Plaintiff Not Entitled to Greater Than .25% of C2 Equity ............................... 22

     (3) Plaintiff Not Entitled to One Percent Interest on One Year Anniversary........... 23

     (4) Plaintiff Not Entitled to Acceleration Due to Constructive Discharge............... 24

D.  Summary Judgment Appropriate for Quasi-Contract Claims.................................... 24

V.  CONCLUSION……………………………………………………………………. 25

## TABLE OF AUTHORITIES

**Cases**

*166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp.*, 78 N.Y.2d 88 (1991) ...................... 19

*Anderson v. Liberty Lobby*, 477 U.S. 242 (1986) ........................................................ 6

*Arena v. Delux Transp. Servs.*, 12-CV-1718 (E.D.N.Y. Feb. 26, 2014) ...................................... 12

*Barfield v. New York City Health & Hospitals Corp.*,
    537 F.3d 132 (2d Cir. 2008) ................................................................ 7, 16

*Bielby v. Middaugh*, 120 A.D.3d 896, 991 N.Y.S.2d 813, 816-17 (App. Div. 2014) ................. 24

*Blake v. Fiit Intern., Inc.*, 2007 WL 980362, *7 (S.D. N.Y. 2007) .............................................. 19

*Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988) ........ 7, 8, 10, 11, 12, 13, 14, 16

*Brown v. New York Cent. R. Co.*, 44 N.Y. 79, 83, 1870 WL 7789 (1870) .................................. 19

*Browning v. Ceva Freight LLC*, 885 F. Supp.2d 590, 609 (E.D.N.Y. Aug. 11, 2012)................. 12

*Bynog v. Cipriani Group*, 1 N.Y.3d 193, 198 (2003) ........................................................ 17

*Byrnie v. Town of Cromwell Board of Education*, 243 F.3d 93 (2d Cir. 2001)............................ 7

*Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 n. 1 (2d Cir.1984) ............................................ 7

*Celotex v. Catrett*, 477 U.S. 317, 322-23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) ...................... 7

*Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440, 445 (2003) .................. 15

*Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*,
    74 N.Y.2d 475, 483 (1989) ........................................................................ 18

*Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006.)............................................ 17

*Fleming v. Ponziani*, 24 N.Y.2d 105, 247 N.E.2d 114 (1969) .................................................... 18

*Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir.1993)............................................................ 7

*Gayle v. Harry's Nurses Registry, Inc.*, No. 12-4764-CV, 2014 WL 6865431, at *1
(2d Cir. Dec. 8, 2014) ................................................................................ 8

*Godoy v. Rest. Opportunity Ctr. of New York, Inc.*,
    615 F.Supp.2d 186 (S.D.N.Y. 2009)............................................................ 9, 10, 11, 15

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933 (1961) ......................... 7

*Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 589 (2d Cir. 2007)............................................ 16

*Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) *cert. denied,* 134 S. Ct. 1516,
    188 L. Ed. 2d 450 (2014) ....................................................................................................... 7

*Mariotti v. Mariotti Bldg. Products, Inc.*, 714 F.3d 761, 768 (3d Cir.) *cert. denied,*
    134 S. Ct. 437, 187 L. Ed. 2d 284 (2013) ......................................................................... 15

*Mark Bruce Int'l Inc. v. Blank Rome, LLP*, 60 A.D.3d 550, 551 (1st Dept. 2009)....................... 19

*Marks v. New York Univ.*, 61 F.Supp.2d 81, 88 (S.D.N.Y.1999) .......................................... 18, 19

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574, 587, (1986)...................................................................................................... 6

*McGuiggan v. CPC Intern., Inc.*, 84 F.Supp.2d 470, 479–80 (S.D.N.Y. Jan. 31, 2000).............. 15

*Nationwide Mut. Ins. Co. v. Darden,*
    503 U.S. 318, 322–23 (1992)................................................................................................. 7

*Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942) ........................................... 16

*RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*,
156 F.App'x 349, 350-51 (2d Cir. 2005)...................................................................................... 18

*Rutherford Food Corp. v. McComb,*
    331 U.S. 722, 729 (1947)...................................................................................................... 7

*Salahuddin v. Goord*, 467 F.3d 263 (2d Cir. 2006*)* .................................................................... 7

*Steelman v. Hirsch*, 473 F.3d 124, 129 (4th Cir. 2007) ......................................................... 8, 15

*Tadros v. Coleman*, 717 F. Supp. 996, 1003 (S.D.N.Y. 1989) *aff'd,* 898 F.2d 10
    (2d Cir. 1990)......................................................................................................................... 8

*Truelove v. Northeast Capital*, 95 N.Y.2d, 223–224 (2000) ..................................................... 17

*United States v. Silk,* 331 U.S. 704, 716 (1947)........................................................................ 16

*Velu v. Velocity*, 666 F. Supp.2d 300, 306–7 (E.D.N.Y. Sept. 30, 2009) ..................................... 16

*Wheeler v. Hurdman*, 825 F.2d 257, 271-72 (10th Cir. 1987)......................................... 7, 15

*Woodman v. WWOR-TV*, 411 F.3rd 69, 75 (2d Cir. 2005) ........................................... 6

*Zhong v. Aug. Aug. Corp.*, 498 F. Supp. 2d 625, 629 (S.D.N.Y. 2007) ......................................... 18

**Statutes**

Fed. R. Civ. P. 12 (b)(6)............................................................................................. 2

Fed. R. Civ. P. 26 (a)…………………………………………………………………  18, 19

Fed. R. Civ. P. 37 (c)(1)……………………………………………………………………18

Fed. R. Civ. P. 37 (b)(2)(A)(iii)……………………………………………………………18

Fed.R.Civ.P. 56(c) .................................................................................................. 6

29 U.S.C. § 206 (a)(1).............................................................................................. 19

29 U.S.C. 203 (e)(1)(g)…………………………………………………………………...7

New York Civil Rights § 50 .................................................................................... 2

N.Y.L.L. § 190(1) .................................................................................................... 16

## I.      SUMMARY OF MOTION

Defendants Clos-ette Too LLC ("C2") and Melanie Charlton Fascitelli ("Charlton") move for partial summary judgment against plaintiff's Fair Labor Standard Act ("FLSA") and New York Labor Law ("NYLL") claims, on the basis that plaintiff Claire Allison was a partner and owner of C2, rather than an employee. Moreover, based on her independence, expertise and authority over the management of C2, she would be considered either an independent contractor or an exempt employee. Defendants also move against plaintiff's breach of contract claims for salary and for certain amounts of C2 equity on the basis that there was never an agreement for salary between plaintiff and C2, and that Allison is entitled to no more than .25% of C2's percentage interest based on the enforceable vesting agreement that she entered with C2. Finally, defendants move to dismiss all quasi contract claims, which cannot be maintained while defendants agree that there is an enforceable agreement covering all compensation.

## II.      STATEMENT OF PROCEDURAL HISTORY

Plaintiff Claire Allison commenced this action by filing her summons and complaint in New York State Supreme Court on February 5, 2014, asserting seventeen (17) separate causes of action against three defendants, C2, Clos-ette LLC and Charlton. Plaintiff's complaint alleges that she was injured by not receiving ownership equity in defendant C2 or salary, for work she alleges she performed over the course of approximately 10 or 11 months. Plaintiff's legal claims are asserted under theories of breach of contract, quasi-contract, fraud and wage and hour violations under the Fair Labor Standards Act (FLSA) and the New York Labor Law (NYLL).

Defendants removed the complaint to the Southern District of New York on March 10, 2014 on Federal Question grounds, based on the FLSA allegations.

On June 9, 2014, the defendants filed two separate motions to dismiss plaintiff's minimum wage claims, fraud claims, promissory estoppel claims, quasi-contract claims, and NY Civil Rights claim, pursuant to Fed. R. Civ. P. 12 (b)(6), for failure to state claims. On July 11, 2014, plaintiff opposed those motions and cross-moved to amend the complaint. Discovery continued while the motions were pending. Plaintiff Claire Allison was deposed on August 19, 2014 and her continued deposition was held on October 1, 2014. Documents were exchanged between the parties throughout this period of time.

On September 15, 2014, Magistrate Judge James C. Francis issued a Report and Recommendation to District Judge Lewis A. Kaplan, recommending dismissal of all seventeen claims asserted against defendant Clos-ette LLC, and recommending dismissal of all claims for fraud, promissory estoppel and New York Civil Rights § 50 claim. As to the wage and hour claims asserted against C2 and Charlton, Judge Francis reported that though "defendants' arguments may raise issues of fact of whether or not Ms. Allison was an employee, and if so, whether she was exempt from minimum wage requirements" nonetheless, the claims against C2 and Melanie Charlton survived at the pleading stage. (Sept 15, 2014 Order, at p. 25, ECF 43.)  No party objected to Judge Francis' Report and Recommendation, which was accepted and ordered by District Judge Lewis A. Kaplan on October 7, 2014. (Oct 7, 2014 Order, ECF 52.)

Discovery was closed on October 17, 2014, except for limited purposes concerning outstanding third-party subpoenas. (Oct. 1, 2014 Order, ECF 49; Oct. 31, 2014 Order ECF 69.) Five witnesses were deposed during discovery: plaintiff Claire Allison, defendant Melanie Charlton, John Fascitelli who is Ms. Charlton's former husband, Melissa Deffenbaugh, who has been an employee of C2, and Gerald Casey, Allison's former supervisor at Lone Star, who was

deposed for the limited purpose, per order of the Court, for his knowledge of the hours Allison worked while employed at Lone Star.

On November 4, 2014, plaintiff moved to amend the complaint to reintroduce the dismissed defendant, Clos-ette LLC, by asserting the same claims against that company as had been asserted in the initial complaint.  On November 17, 2014, plaintiff moved to quash defendants' third-party subpoenas for records and a deposition of plaintiff's former employer. On November 21, 2014, defendants wrote a letter to Judge Francis, copying plaintiff, requesting that a motion be heard concerning plaintiff's refusal to provide a damages computation on her wage and hour claims.  (Deft's Nov 21, 2014 Letter to Court, ECF 91.) Judge Francis declined to hear the motion on the basis that the procedure for Local Rule 37.2 Letters had expired. (Nov 26, 2014 Order of Hon. James Francis, ECF 95.) On January 9, 2015, Judge Francis issued an order denying plaintiff's motion to amend the complaint, denying plaintiff's motion to compel additional discovery, and denying in part, and granting in part, plaintiff's motion to quash the Lone Star subpoenas. (Jan 9, 2015 Order, ECF 98.)

### III.    STATEMENT OF FACTS[1]

Allison first contacted Charlton by email in November 2011 after learning of a job posting for defendant C2, an online retail start-up company owned by Charlton. On this basis, Allison sent Charlton her resume and requested an interview. At the time, however, Allison was employed full time, working 60 to 80 hours a week for a private equity firm, Lone Star Funds ("Lone Star"), as a senior vice president. (Exhibit B; Exhibit Y at pp. 73-74)

Several months later, in March 2012, Allison and Charlton met for the first time over lunch. The two discussed a possible working relationship, and Charlton asked Allison if she

---

[1] Defendants refer also to the Local Rule 56.1 Statement of Undisputed Facts to supplement this recitation of facts.

could assist her in refining a business plan and creating a "teaser deck" to market to potential investors in the company, and Allison said that she could. The two discussed the goals of finding investors for the start-up company, and Allison was interested in participating. They did not discuss compensation.

Allison provided her draft of the teaser deck to Charlton on May 4, 2012, which was the first work she provided for C2. From that point forward, Allison continued to provide assistance to the company in her "spare time," (Exhibit B, p. 3) while working full-time for Lone Star. Allison's assistance had mainly to do with the review and development of marketing materials for potential equity investors in C2. All of Allison's work was done outside of the C2 offices, and Allison did not account for any of the time she worked. (Exhibit AA at pp. 155-156) She did not answer to Charlton specifically, because Charlton was unable to perform the tasks she asked Allison to perform, and might not have even known the correct questions to ask. (Exhibit AA at p. 156.)

Eventually, Charlton would provide Allison with access to all company financials, vendor contacts, investor contacts, and access to the company's lawyers, advisors and accountants. Allison made it known to Charlton, however, that her work for Lone Star had priority over the work for C2, and her timing for working on C2 projects was secondary to what she did for Lone Star. (Exhibit U.)

It was not until about September 2012, 6 months after meeting Charlton, that Allison first discussed the question of salary and compensation. They discussed salary numbers, but there was no agreement about what role Allison would have, what title she would receive, or when she could or would be hired by the company all of which they agreed was dependent upon the company's ability to secure sufficient financing. According to Allison, there was an agreement

4

that she would be hired and receive a salary once a significant financing round was complete. It was also discussed that Allison would be receiving equity as her compensation for the work she was doing, and that the equity would vest over time if she continued to do work for C2. Both Allison and Charlton agreed to these concepts.

On November 7, 2012, Allison provided Charlton with a proposed vesting schedule, to receive a total amount of 8% of the company, and an additional 2% contingent upon certain future events. (Exhibit E.) Charlton disagreed with the amount and with the vesting schedule.

Eventually, on November 16, 2012, the two agreed that Allison would receive 1% fully vested company interest upon the one year anniversary of her working for C2, which start date was agreed to have been May 2012, requiring Allison to remain with C2 until May 2013 to collect that 1% of fully vested equity. (Exhibit K; Exhibit N.) Charlton and Allison also agreed that Allison would be granted another 3% that would vest in equal parts over three years on a quarterly basis. (Exhibit K; Exhibit N.) This meant that at the end of each three-month quarter, Allison would receive another vested .25% of C2's percentage interest as long as she continued to do work for C2. And finally, another four points were designated to Allison, subject to certain triggers having to do with company valuations and company performance. (*Id*.) These last four points would then be subject to three year vesting schedules. (Exhibit GG at p. 399.)

In December 2012, Allison was terminated from Lone Star. Charlton did not learn about the termination until Allison returned from an international vacation in January 2013. (Exhibit M.) In January 2013 and again in February 2013, Allison asked Charlton about the time horizon for receiving salary, but notified Charlton that receiving salary was not yet necessary. (Exhibit M.) Charlton, again informed Allison that no salary could be paid, nor could any persons be hired as employees, until there was significant financial resources. (Exhibit H; Exhibit M.)

5

Allison knew that C2 had not closed a round of funding nor had the revenues to support salaries, and continued to provide services without salary. At the end of March 2013, Allison stopped working for C2. (Exhibit DD, at pp. 321-22.) On April 4, 2013, Allison informed Charlton that she was no longer interested in providing any services for C2, but would retain her equity and remain only an owner of C2. (Exhibit I.)


IV.     ARGUMENT

A.     STANDARD OF REVIEW UNDER FED. R. CIV. P. 56.

The movant bears the burden of showing she is entitled to summary judgment. (*See Anderson v. Liberty Lobby*, 477 U.S. 242 (1986)). Once the moving party demonstrates a *prima facie* entitlement to summary judgment, "the non-moving party must come forward with 'specific facts showing that there is a genuine issue for trial.' " *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)). Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A "material" fact supports the proof of an issue that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The issue is considered "genuine" when the proof that supports it is evidence for which "a reasonable jury could return a verdict for the non-moving party." *Id.* The Court must view the evidence, and the factual inferences arising from that evidence, in the light most favorable to the non-moving party, *Woodman v. WWOR-TV*, 411 F.3[rd] 69, 75 (2d Cir. 2005), but allegations in the pleadings alone and speculation are insufficient to create a genuine issue of

material fact.  *Salahuddin .v Goord*, 467 F.3d 263 (2d Cir. 2006*); Byrnie v. Town of Cromwell Board of Education*, 243 F.3d 93 (2d Cir. 2001).

B.   SUMMARY JUDGMENT MUST be GRANTED TO CLAIMS UNDER FLSA & NYLL

(1)   Claire Allison was a Partner, Not an Employee Under the FLSA

The FLSA defines "employee" in a circular manner as 'any individual employed by an employer.' 29 U.S.C. §§ 203(e)(1), (g) ("Employ" as "to suffer or permit to work.") *Id*. In light of the remedial nature of the statute, and in order to create a workable definition for "employee," the federal courts have fashioned the "economic realities test" that serves to stretch the FLSA definition of employee beyond the ordinary common law analysis of master and servant. *Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 322–23 (1992); *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961); *Rutherford Food Corp. v. McComb,* 331 U.S. 722, 729 (1947);  *Frankel v. Bally, Inc.,* 987 F.2d 86, 89 (2d Cir.1993).

The Second Circuit "has treated employment for FLSA purposes as a flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances" and has "identified different sets of relevant factors based on the factual challenges posed by particular cases." *Irizarry v. Catsimatidis*, 722 F.3d 99, 104 (2d Cir. 2013) *cert. denied,* 134 S. Ct. 1516, 188 L. Ed. 2d 450 (2014) (quoting *Barfield v. New York City Health & Hospitals Corp.*, 537 F.3d 132, 141-43 (2d Cir. 2008)*,* 537 F.3d at 141–42.

Independent contractors and business partners are generally excluded from the FLSA definition of employee, excluded from coverage under the statute, through the application of the "totality of the circumstances" analysis via the economic realities test. *See*, *Goldberg v. Whitaker House Coop., Inc.,* 366 U.S. 28, 33 (1961); *Carter v. Dutchess Cmty. Coll.,* 735 F.2d 8, 12 n. 1 (2d Cir.1984). *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1058 (2d Cir. 1988); *Wheeler v.*

*Hurdman,* 825 F.2d 257, 277 (10th Cir.1987); *Steelman v. Hirsch,* 473 F.3d 124, 129 (4th Cir. 2007); *Godoy v. Rest. Opportunity Ctr. of New York, Inc.*, 615 F.Supp.2d 186 (S.D.N.Y. 2009); *Tadros v. Coleman*, 717 F. Supp. 996, 1003 (S.D.N.Y. 1989) *aff'd,* 898 F.2d 10 (2d Cir. 1990) ("According to established case law, partners are not employees and independent contractors are not employees.")

In *Gayle v. Harry's Nurses Registry, Inc.*, No. 12-4764-CV, 2014 WL 6865431, at *1 (2d Cir. Dec. 8, 2014), the Second Circuit recounted the economic realities test as had been annunciated by the Court in *Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir.1988):

> "Our analysis of the relationship turns on the economic-reality test, which weighs (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business."

*Citing Brock,* at 1058–59. "No one of these factors is dispositive; rather, the test is based on a totality of the circumstances." *Gayle v. Harry's Nurses Registry, Inc., (citing Brock*) at 1059.

Allison never considered herself to be while she was working to "launch" the new company in her "spare time."  Instead, Allison acted as, and considered herself as, an equity partner in C2, and it was agreed that the work she was providing would be compensated with company equity. The relationship between Allison and C2 also falls into the category of independent contractor, whereas Allison was performing as a consultant to C2 in order to receive equity. She was not, however, an employee, did not act as an employee, was not dependent upon C2 economically, and did not consider herself to be an employee while providing her services.

The central inquiry in determining whether a person is an FLSA employee is a question of whether the putative employer controls the person's work. *See*, *Zheng v. Liberty Apparel Co. Inc.*, 355 F.3d 61, 66 (2d Cir. 2003); *Herman v. RSR Security Services Ltd.,* 172 F.3d 132, 139

8

(2d Cir.1999) ("[T]he overarching concern is whether the alleged employer possessed the power to control the workers in question.") In this case, Allison exercised control over the manner and means of her work for C2, and acted as an owner of C2. And this was reasonable, because C2 had provided Allison the opportunity to own a range of equity percentages subject to a vesting schedule. *See*, *Godoy v. Rest. Opportunity Ctr. of New York, Inc.*, 615 F. Supp. 2d 186, 195 (S.D.N.Y. 2009)("While Plaintiffs were not, as yet, partners of the business they were working with Defendants to create, Plaintiffs devoted the hundreds of hours of work for which they now seek compensation under the FLSA in explicit exchange for co-ownership of the business.") Allison's independent work was provided with the expectation of ownership, without submitting to C2's control or economic dependency.

(2)     *Brock* Factors Demonstrate Plaintiff Was Not an Employee.

    (i)     Degree of Control C2 Exercised Over Plaintiff.

Defendants did not control the time or location of Allison's work for C2, nor did defendants put any constraints on the method and means of Allison's performance. Allison performed services for C2 while she was a full time employee at Lone Star and during this period of time none of her work for C2 was performed in C2's offices, and she only went to the office on three occasions, primarily for social reasons.  (Exhibit QQ, at pp. 311-12.)

Claire did not submit time records, and Charlton did not require her to. (Exhibit AA.) This meant that Charlton had no way to know how Allison was spending her time. Plaintiff also did not provide Charlton copies of all work product, most of which, if it exists,[2] was kept on Allison's home computer. (Exhibit AA, at pp. 151-52.) Allison states that she has no way of determining the number of hours she worked for C2, has no records, kept no hours and cannot

---

[2] Defendants made demands for all of Allison's work product, including iterations of business plans, financial models, presentations and other work product. It is unclear to what extent these materials were provided other than copies of emails and some presentations that were in the possession of defendants prior to litigation.

extrapolate the hours from the work product. (Exhibit AA.) This demonstrates that Allison was in full control of her time and managed it according to her own decision-making and schedule.

Plaintiff states that she only worked for C2 in her "spare-time," and states explicitly in several communications to Melanie during the course of the relationship, that Lone Star was her priority. (Exhibit B at ¶ 18) She would arrange meetings for C2 according to her availability with Lone Star work, she would delay work for C2 based on work that had to be done for Lone Star (Exhibit U), and she refused to be identified on C2 marketing materials because it could compromise her position with Lone Star. (Exhibit F.) Claire even warned that she could lose her job at Lone Star, which she sought to prevent, if her supervisors at Lone Star were to learn about her involvement with C2. (Exhibit F.) Charlton made no objections to Allison's conduct in this regard, and did not "express the right to supervise" Allison. *See*, *Brock v. Superior Care, Inc.*, 840 F.2d at 1060.

These facts strongly favor a finding that Allison was not an employee of C2.

(ii)    Plaintiff's Opportunity for Profit or Loss and Investment in C2.

The very nature of Allison's relationship with C2 was an investment of work in exchange for sweat equity, for which she would receive an opportunity to profit depending upon the success of the new business. *See, e.g.*, *See*, *Godoy v. Rest. Opportunity Ctr. of New York, Inc.*, 615 F. Supp.2d 186. Plaintiff's primary goal for compensation with C2 was to receive company equity. (Exhibit TT, at p. 303.) During her November 2012 negotiations for equity, Allison made several statements that she was substituting equity amounts for salary that she would otherwise have received. Allison knew of the significance of a start-up company that offers a prospective return for equity holders in a new company, if the company gets financing. Allison's job at C2

10

was to get financing through an offering of company equity to investors, and she wanted to receive up to 10% of the company's equity, and voluntarily worked without receiving a salary.

Allison was responsible for the investor decks, and investor marketing materials. (Exhibit B at ¶ 23.) Allison worked on the company valuation, and discussed with Charlton and C2's lawyer, Noah Leichtling, the terms of the equity offering and the necessary disclosures to investors. (Exhibit N.) Allison gave her opinion to Charlton and to Leichtling that the company valuation of $12 million was too high and perhaps not supportable. (Exhibit M.) Allison also discussed with Charlton the compensation offered to other prospective employees that would be hired at such a time that the company received sufficient capital. (Exhibit H.) Allison was in regular communication with Leichtling, with and without copies going to Charlton, concerning the final language on offering materials and development of the company's capitalization table. (Exhibit N; Exhibit O.) Plaintiff's goal was aligned with the goal of C2 insofar as the hope and need for finding C2 investors would allow the company to grow, and succeed. Allison wanted to be a part of that success from the beginning.

Claire Allison's primary interest was in having the opportunity to share in the profits or losses of C2, she had "the opportunity for profit or loss" and her "investment in the business" was not "negligible." *Brock v. Superior Care, Inc.,* 840 F.2d 1054 (2d Cir.1988). This factor also strongly favors a finding that Allison was not an employee of C2 but an owner. *See Godoy v. Restaurant Opportunity Ctr. of New York*, 615 F. Supp.2d 186, 195 (S.D.N.Y. May 1, 2009) ("Like partners at a firm, Plaintiffs, as putative co-owners of the business they were working to create, 'assume[d] the risks of loss and liabilities' of the venture, and had a real opportunity to share in its profits upon success.") (citation omitted).

11

(iii)   <u>Plaintiff's Skill and Independent Initiative Required to Perform Work</u>.

Allison held herself out at as an executive-level manager with finance, investment and marketing expertise. (Exhibit A; Exhibit B at ¶¶ 7, 16–17, 19–20, 23, 27, 29.) According to Allison, she performed tasks at a "high" executive level for C2, and Charlton was not "equipped" to perform these same tasks. (Exhibit GGG.) Allison's work on investor materials, both in terms of investor marketing, and financial and legal, were areas in which Charlton was unfamiliar, and that is why Allison was there. (Exhibit YY.)

Charlton did not instruct Allison on how to perform these tasks and did not give her much direction. Allison would go to investor meetings and interviews for potential new hires without Charlton. (Exhibit B, at ¶¶ 19, 27; Exhibit UU.) Allison also communicated directly with C2's corporate attorney concerning capitalization tables, and representations to potential investors in the investment disclosures. (Exhibit N; Exhibit O; Exhibit NN.) She worked at home, at her own time and without providing reports on the hours she worked. (Exhibit AA, at p. 151) Allison was truly independent, and provided consult and advice on sophisticated matters outside of Charlton's knowledge. This factor immensely favors the finding that Allison was not an employee. *Cf. Browning v. Ceva Freight LLC*, 885 F. Supp.2d 590, 609 (E.D.N.Y. Aug. 11, 2012) (plaintiff truck drivers deemed independent contractors; professional driving skills for trucks considered specialized skillset that weighed in favor of independent contractor); *Arena v. Delux Transp. Servs.*, 12-CV-1718 (E.D.N.Y. Feb. 26, 2014) (ability to set own schedule at plaintiff's discretion and terminate agreements at will weighs in favor of independent contractor relationship).)

It is understood from the *Brock* factors that "the fact that workers are skilled is not itself indicative of independent contractor status" and that "a variety of skilled workers who do not

exercise significant initiative in locating work opportunities have been held to be employees under FLSA." *Brock v. Superior Care, Inc.,* 840 F.2d 1060. Nonetheless, courts have found that workers who exercise "business-like initiative" and "use these skills in any independent way" favor a finding of independent contractor. (*Id.)*

In this case, Allison used her skills independently and took business-like initiative to create teaser decks, financial projections and investor packages. Allison used her skills in an independent way and her actions clearly indicate that she was not an employee who was dependent on C2's direct control.

(iv.)    <u>Permanence and Duration of Plaintiff's Working Relationship at C2.</u>

Allison's priority during her relationship with C2 was her employment as Vice President of Lone Star. (Exhibit U.) Allison went out of her way to make sure that her name was not on a public disclosure of her association with C2, in C2's printed investment materials, to prevent Lone Star from learning of that association. (Exhibit F.) Allison also accepted a promotion and sought and received a promise from Lone Star management that she had a "future" with Lone Star for another five years or longer, during the period of time that she was doing work for C2. (Exhibit X.)

During their equity negotiations, Allison made it known to Charlton that she could leave if she did not believe she was receiving appropriate compensation. (Exhibit D.) Discussions concerning this compensation and a possible future hire were ongoing. (Exhibit Q.) Allison stated in February 2013 that, though she did not need to receive a salary at that time, sometime in the future she would need a salary. (Exhibit M.)

Charlton and Allison openly negotiated vesting schedules for the equity grant in order to incentivize Allison to remain with the company rather than leave prematurely. (Exhibit R.)

Allison was not ordinarily beholden to C2, and could walk away from the company at any time, and declare herself an equity holder, and that is what she did on April 4, 2013. (Exhibit I.)

This fourth factor favors a finding that Claire was not an employee of C2.

(v.)   Extent to Which Plaintiff's Work was Integral Part of C2's Business.

Allison's work for C2 was dedicated to finding investors for the company. (Exhibit B, at ¶ 16, 20.) Her work was not in and of itself integral to the products or functioning of the business, but instead was seeking the collateral purpose of supporting the business by finding a means of capitalization. (*Id.*) To the extent that Allison did any other work for C2 that would have been more in line with its basic functioning, none of that work has been documented, nor can Allison quantify it in any way. (Exhibit AA.)  However, it is beyond dispute that Allison's function with C2 was directed towards finding investment. Unlike in *Brock,* where the "services rendered by the nurses constituted the most integral part of" the company's business, Allison's work done for C2 was in no way integral to the main business purpose of C2.

This fifth factor also augers in favor of a finding that Allison was not an employee.

(3)   Allison Was an Equity Member Not an Employee.

Allison's basis for working with C2 was a contractual exchange for equity ownership. Allison was not under the control of management, but instead was part of the management. Allison discussed with Charlton the compensation amounts to provide to potential hires, Tom Achtemichuk and Linley Taber, discussed how to treat future salaries for all employees, and how to treat her own future salary, made decisions about marketing the business to investors, and dealt directly with the company's lawyers concerning the highest level decisions affecting management. (Exhibit N; Exhibit O.) Allison was entrusted with the company's financial records, including sales records, bank accounts, vendor information, investment leads, legal

14

counsel, accounting and bookkeeping services, and with access to the company's website through Melanie's passwords. (Exhibit III.) Allison agreed not to take a salary for all of the time she provided work to C2, and was not dependent upon C2 for her economic well-being, and stated this to Charlton on many occasions.  (Exhibit M; Exhibit N.) There is no question that Allison bargained for equity in exchange for her work done for C2.

As the Court in *Godoy v. Restaurant Opportunity Center of New York, Inc*., 615 F.Supp.2d 186, 194 (S.D.N.Y. 2009) noted, the factors of the economic reality test are "largely useless in a general partnership context." (*quoting*) *Wheeler v. Hurdman*, 825 F.2d 257, 271-72 (10th Cir. 1987). In *Godoy*, the plaintiffs had worked more than 100 hours each, without pay, in furtherance of an equity stake in a future restaurant business that they hoped with the defendants to create.  *Godoy* at 195. The Court found that "as putative co-owners of the business they were working to create, 'assumed the risks of loss and liabilities' of the venture, and had a real opportunity to share in its profits upon success." *Id*. The Court determined that the "sweat equity" contributed by the *Godoy* plaintiffs, though it went unrealized to them, represented a capital contribution in the business, rather than hours endured at the direction of an employer. *Id*.; *see also*, *Mariotti v. Mariotti Bldg. Products, Inc.*, 714 F.3d 761, 768 (3d Cir.) *cert. denied*, 134 S. Ct. 437, 187 L. Ed. 2d 284 (2013)(Plaintiff fails to state a claim as employee where he was "a shareholder, a director, and a corporate officer gave him both substantial authority . . . and the right to control the enterprise. . . . [and] ability to participate in the fundamental decisions of the business." (*citing*) *Clackamas Gastroenterology Associates, P. C. v. Wells*, 538 U.S. 440, 445 (2003)); *Steelman v. Hirsch*, 473 F.3d 124 (4th Cir. 2007); *see also McGuiggan v. CPC Intern., Inc.*, 84 F.Supp.2d 470, 479–80 (S.D.N.Y. Jan. 31, 2000) ("[I]f the Plaintiffs were in

business for themselves, they were not employees; if they were economically dependent on and within the direct control of [Defendant], they were employees.").

(4)     <u>Allison Was an Independent Contractor, Not an Employee</u>.

Under the traditional economic analysis of *Brock v. Superior Care, Inc.,* 840 F.2d 1054, as derived from *United States v. Silk,* 331 U.S. 704, 716 (1947), Allison was not dependent or under the control of C2, and must have been considered an independent contractor rather than an employee. The essential question of the FLSA's application to this case "is whether the putative employee is economically dependent on the putative employer." *Velu v. Velocity Express, Inc.*, 666 F.Supp.2d 300, 306 (E.D.N.Y. Sept. 30, 2009).

Plaintiff's admissions show that she worked to obtain equity in C2 rather than any agreed-to salary; that Plaintiff never intended to rely upon C2 for her financial needs; and that at any time Plaintiff had the expertise, skill and ability to walk away from C2. The wage and hour laws, particularly the FLSA, were designed to "ensure that employees receive a 'fair day's pay for a fair day's work." *Gorman v. Consol. Edison Corp.*, 488 F.3d 586, 589 (2d Cir. 2007) *quoting Overnight Motor Transp. Co. v. Missel*, 316 U.S. 572, 578 (1942). Allison, as a skilled professional providing spare time work at C2 in exchange for a promise of company equity and the risks and potential rewards associated with company ownership, is not the class of plaintiffs that the FLSA and NYLL were envisioned to protect.

(5)     <u>Allison is an Owner and Independent Contractor Under the NYLL</u>.

Determination of whether a person was an employee or independent contractor under the NYLL rests primarily on the "degree of control" analysis, which is essentially incorporated into *Barfield*'s first factor. Plaintiff's status as an employee or independent contractor is analyzed under the FLSA standards but applied to both. *See Velu v. Velocity*, 666 F. Supp.2d 300, 306–7

16

(E.D.N.Y. Sept. 30, 2009); *see also Bynog v. Cipriani Group*, 1 N.Y.3d 193, 198 (2003) ("[T]he critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results."); *Truelove v. Northeast Capital*, 95 N.Y.2d 220, 223–4 (2000) ("Courts have construed [NYLL § 190(1)'s] statutory definition as excluding certain forms of "incentive compensation" that are more in the nature of a profit-sharing arrangement and are both contingent and dependent, at least in part, on the financial success of the business enterprise.") (citations omitted).

(6)     <u>Allison's Refusal to Provide Damages Computation Requires Dismissal of FLSA Claims</u>.

Allison has provided no computation of damages as is required pursuant to Rule 26 (a)(2), which "requires a party to provide a computation of any category of damages voluntarily, *i.e*., 'without awaiting a discovery request'." *Design Strategy, Inc. v. Davis*, 469 F.3d 284, 295 (2d Cir. 2006.)  Rule 26 (a) specifically requires plaintiffs claiming damages to disclose "a computation of each category of damages claimed . . . [and] . . . make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Rule 37 (c)(1) provides the remedy for refusing to disclose "information or identify a witness as required by Rule 26(a) or (e)" in that the "party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless," and may be subject to additional remedies under 37 (b)(2)(A), including striking pleadings or rendering a default judgment against the party. *See*, Rule 37 (b)(2)(A)(iii) and (vi).

17

Defendants separately demanded plaintiff's computation of FLSA damages by interrogatories and by letter. (Exhibit KKK; Exhibit JJJ; Exhibit LLL.) Plaintiff has already admitted that she will not be able to specify any such claim at trial because she cannot reconstruct her hours, she never informed Charlton of her hours worked, and C2 cannot be expected to know of Allison's hours because Charlton never required Allison to perform her services on C2's premises. These claims would also be dismissible at the time of trial. *See, e.g.*, *Zhong v. Aug. Aug. Corp.*, 498 F. Supp. 2d 625, 629 (S.D.N.Y. 2007) (Plaintiff must "provid[e] enough information to give [defendant] sufficient notice from which to calculate the alleged [minimum wage] damages" in order to maintain a claim under § 206 (a)(1) of the FLSA.)

Plaintiff has had sufficient time to remedy this defect by meeting her obligations under pursuant to Rule 26 (f), but has done nothing. The appropriate remedy is to strike plaintiff's FLSA and NYLL minimum wage claims.

C.    Partial Summary Judgment is Appropriate on Plaintiff's Breach of Contract Claims

The elements of a breach of contract claim in New York are: (1) the existence of a contract, (2) performance by the party seeking recovery, (3) non-performance by the other party, and (4) damages attributable to the breach. *See Marks v. New York Univ.,* 61 F.Supp.2d 81, 88 (S.D.N.Y.1999); *RCN Telecom Servs., Inc. v. 202 Ctr. St. Realty LLC.*, 156 F. App'x 349, 350-51 (2d Cir. 2005). A plaintiff seeking to enforce a contract claim has the burden of proving by a preponderance of the evidence that a contract has been formed, *i.e.* that there is a good and valid contract having a legal inception that was binding upon the defendant. *Fleming v. Ponziani*, 24 N.Y.2d 105, 247 N.E.2d 114 (1969).

Few principles are better settled in the law of contract formation than the requirement of definiteness. *Cobble Hill Nursing Home, Inc. v. Henry and Warren Corp.*, 74 N.Y.2d 475, 483

(1989); *see also Brown v. New York Cent. R. Co.*, 44 N.Y. 79, 83, 1870 WL 7789 (1870) ("if there are essential elements affecting the rights of the parties, which are not implied by, or to be inferred from what the parties have agreed upon, but left open for future consideration and adjustment, the contract as a whole lacks completeness, and no action can arise upon it."). Even though a specific obligation may be definite enough to be enforced, the obligation might not be enforced if it is part of a larger agreement that is indefinite. *See Blake v. Fiit Intern., Inc.*, 2007 WL 980362, *7 (S.D. N.Y. 2007); *see also* 28 N.Y. Prac., Contract Law § 2:15.

A court cannot enforce a contract unless it is able to determine what in fact the parties have agreed to. *166 Mamaroneck Ave. Corp. v. 151 East Post Road Corp.*, 78 N.Y.2d 88 (1991). The parties must make a manifestation of mutual assent sufficiently definite to assure that they are truly in agreement with respect to the material terms of their contract. Before a party may enforce a contractual right, it must first find that the contract is sufficiently definite to allow it to ascertain the terms of the parties' agreement. 28 N.Y. Prac., Contract Law § 2:15.

An exchange of e-mails may be too indefinite to create an enforceable agreement when the e-mails do not contain the essential terms of the parties' agreement or an objective standard to determine those terms. *See Mark Bruce Int'l Inc. v. Blank Rome, LLP*, 60 A.D.3d 550, 551 (1st Dept. 2009) ("The exchange of e-mails, which did not set forth the fee for plaintiff's services or an objective standard to determine it, was too indefinite to be enforceable.")

Plaintiff's case is essentially a breach of contract action to pay plaintiff, agreed upon compensation for work done for C2 between April or May 2012 and March 29, 2013.[3] Plaintiff asserts that she and Charlton, who was acting on behalf of C2, agreed that Allison would receive salary in the amount of $150,000, and would receive title to company equity, in the form of

---

[3] These dates are set forth in the plaintiff's complaint, however, in writing she agreed that her "start date" with C2 was in May 2012, and during her deposition she repeatedly testified that she stopped working in March 2013. Her complaint alleges that the first work provided to Melanie Charlton was on May 4, 2012. (Exhibit B ¶ 20)

limited liability company percentage interest. Plaintiff bases her claims for salary and equity on writings in the form of emails and an attached "term sheet."

The term sheet, the terms of which were agreed upon on November 30, 2012, speak only to the granting and vesting of equity, pursuant to a schedule. (Exhibit G.) The alleged agreement on salary appears to be based on some emails discussing salary contingent upon certain future events. Though Allison is now claiming to be entitled to eight percentage points (8%) of C2 membership interest and back salary starting from March 2012, when she first met Charlton, when she voluntarily departed in April 2013, she claimed only to be entitled to 3% and made no claim for salary, or back wages. (Exhibit B ¶ 38.)

Plaintiff's breach of contract claims are subject to partial summary judgment, however, because Allison's admissions show that she worked voluntarily without the expectation of salary for all times she was at C2, and that the terms of the agreed upon November 30, 2012 vesting schedule could only entitle her to 0.25% percentage interest in C2.

(1)     There is No Enforceable Contract Entitling Allison to Receive Unpaid Salary.

In order for a contract to be enforceable in New York, it must be sufficiently clear by its terms. *See Marks v. New York Univ.,* 61 F.Supp.2d 81, 88 (S.D.N.Y.1999). In this case, there is no unambiguous writing that would entitle Allison to salary. Instead, there are discussions between Allison and Charlton about what a future salary Claire would accept if and when C2 had sufficient capital to hire her as an employee.  Other issues that would have to be agreed upon, if C2 were to be in the position to hire Allison and pay a salary, would be the position for which Allison was going to be hired, and her job responsibilities.  The emails and discussions regarding potential salary was a future promise dependent on sufficient capital and revenue.

When asked at her deposition whether she was willing to work without a salary at least until the time Lone Star terminated her, she answered, "I was willing to do – yes, I think that's fair." (Exhibit PP, at p. 303Allison repeatedly stated that she was working without being paid and was not entitled to a salary. For instance, Allison also admits that Charlton told her that she was working for equity and not for a salary during the period she was working with C2 (Exhibit B, at ¶ 36), and Allison continued to work nonetheless. On January 17, 2013 Allison writes to ask Charlton, "at what point of monthly revenue are you comfortable to start me on the payroll . . . I am trying to gauge when I will actually be able to receive a paycheck" (Exhibit H.), Charlton responds "when we receive first investor and/or bank debt worth your annual salary plus overlay of benefits I will start you at 150k salary." (*Id.*) She continues to work after this conversation. (Exhibit PP, at p. 304.)

On February 16, 2013, Allison writes to Charlton in an email that is "trying to do this for as long as I can without being paid . . . Not making money is a stress at home and while I will do it for as long as I can bc I do believe in this, you and us, at some point I do have to make a salary. . . . I am not saying that is today but it's not a choice I can make in a vacuum anymore." (Exhibit U.) Charlton again notified Allison on February 16, 2013 that "you will be the first person on salary when the money is raised." (Exhibit M.)

Allison testified at her deposition that the "trigger" for the "employment," which would have included being hired by C2 and being paid salary, depended upon a closed and final round of financing. (Exhibit RR, at pp. 324-26.) However, there was no agreement as to what amount was required to trigger these events. (*Id.*) This would be an essential and material term of an agreement, as to what event would require C2's performance in paying salary, but there is no

21

such agreement. The reality was, that it was a decision that would be made in the future by the management, based on C2's available financial resources.

(2)    Allison is Not Entitled to More Than .25% of C2 Equity Pursuant to the Agreement.

The negotiations between Allison and Charlton to determine Allison's equity percentage and conditions, upon which it would be vested, began in earnest in November 2012. It was generally understood between the two parties that Allison was being compensated for the work she had provided and future work through a grant of C2 ownership equity, that would vest to Allison upon certain conditions. The reasons for this, as stated both by Allison and Charlton in emails during their negotiations, was that C2 and Charlton needed to be protected against a full grant of vested equity inuring to Allison's benefit, without condition that she continuing working with C2.  (Exhibit D; Exhibit K.) The general idea was that the equity should be set aside in a grant, and if Allison stayed working with C2, she would receive title of the equity. (Exhibit K.)

On November 16, 2012, Allison drafted and sent to Charlton a proposed term sheet for the grant of the C2 equity. (Exhibit E.) This term sheet stated that Allison would receive:

"1) 3 points up front
 2) 1 point for 1 year anniversary with company (starting when relationship started in
    May 2012)"

(Exhibit E.)

In addition, Allison included a chance to earn another four (4) points of vested equity upon certain conditions. (*Id*.)

Charlton objected to the first above proposed term ("3 points up front") on the basis that it had no vesting "timelines." (Exhibit D.) In response to this, on November 16, 2012, Claire agreed that the "3 points granted up front" would be subject to "a vesting schedule of 3 years." (Exhibit K; Exhibit GG, at pp. 396-97.) It was proposed and agreed to that the three points in

"1)" were subject to a "vesting schedule of 3 years" and "vesting in equal amounts on a quarterly basis." (*Id.*) Allison herself states that she is "OK with adding a vesting schedule of 4 years." (*Id.)* Therefore, in order for the three points to vest in equal parts over three years on a quarterly basis, they would vest at .25% every three months that Allison did work for C2. Charlton and Allison agreed to this general structure by November 30, 2012. (Exhibit EE, at pp. 374-75; Exhibit SS at pp. 414-15; Exhibit T.)

There is no disagreement that the three points that were "granted up front" were subject to a three year vesting schedule "in equal amounts on a quarterly basis" (CA p. 399). However, by its terms, the November 30 term sheet does not set forth the start date for when the equity will begin vesting.

The only reasonable interpretation for this provision is that the "3 points granted up front" will vest at the rate of .25 percentage points per annual quarter. If the 3 points began to vest on November 30, 2012, Allison left C2 on March 29, 2013, four months later, which is one month more than a single quarter, but if vesting on a quarterly basis, only .25% would have vested. If the vesting of those three points began at any point thereafter, Claire could be entitled to fewer than .25% of C2 equity. Under no reasonable circumstances, however, would Allison be entitled to any more than .25% of C2 membership interest, and summary judgment must be granted as to any claim she seeks to maintain for that additional amount.

(3)     Allison is Not Entitled to One Percent Interest on One Year Anniversary.

Allison admits that the November 30 Term Sheet sets May 2012 as the start date for the one year cliff vest, and that she left C2, voluntarily, on March 29, 2013. (Exhibit HH; Exhibit JJ; Exhibit KK.) Summary judgment must therefore be granted to deny any claim Allison has to

23

possession of the 1 point based on a "cliff vest" in "2)" of the November 30, 2012 term sheet, because Allison did not meet the agreed upon condition to stay with C2 for a full year.

(4)     Allison is Not Entitled to Acceleration Due to Constructive Discharge.

Allison claims to be entitled to the remaining four percentage points on the grounds that she was constructively discharged.  Constructive discharge occurs when the employer, rather than acting directly, deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation" *Bielby v. Middaugh*, 120 A.D.3d 896, 991 N.Y.S.2d 813, 816-17 (App. Div. 2014).

Here, Allison was not an employee of C2 and even if she was, she has set forth no facts alleging that her working conditions were so intolerable that she was forced to involuntarily resign. Instead, Allison wrote to Charlton that she was voluntarily stopping work, stating in an email written on April 4, 2013: "I can no longer work for the company, and must limit my role to that of an equity holder. . . . 3% of my equity in the company has already vested. In that spirit, I wish you and the team the best of luck." (Exhibit I.) Summary judgment is appropriate for all claims for equity based on a theory of constructive discharge.

D.     Summary Judgment is Appropriate for Quasi-Contract Claims.

To the extent that a valid and undisputed written contract covers the subject matter alleged under a quasi-contract claim, the quasi-contract claim is duplicative and not permitted. *Mid-Hudson Catskill Rural Migrant Ministry, Inc. v Fine Host Corp.*, 418 F.3d 168, 175 (2d Cir. 2005). Here, there is a valid agreement for compensation set out in the November 2012 Term Sheet, which entitles Allison to certain amounts of C2 equity upon certain conditions. Because certain vesting triggers were not met, as discussed above, Allison is not entitled to the full equity

she claims. This contract suffices to cover all compensation for which Allison is entitled, and therefore, plaintiff's quasi-contact claims must be dismissed.


<u>CONCLUSION</u>

WHEREFORE, for the foregoing reasons stated, defendants respectfully request that the Court grant summary judgment dismissing plaintiff's wage and hour claims under the FLSA and NYLL and breach of contract claims, on the basis that defendants state a *prima facie* case entitling them to summary judgment on these claims, and because plaintiff can raise no genuine issues of material fact to deny summary judgment, and with all other necessary and reasonable relief as the Court deems necessary and proper.

Dated: New York, New York
       February 11, 2015

**MANGAN GINSBERG LLP**

/s/
_____
By: Michael P. Mangan (MM-5773)
*Attorneys for Defendants*
80 Maiden Lane, Suite 509
New York, New York 10038
Phone: (212) 248-2171