```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - -:
CLAIRE ALLISON,                      :  14 Civ. 1618 (LAK) (JCF)
                                     :
          Plaintiff,                 :       REPORT AND
                                     :     RECOMMENDATION
     - against -                     :
                                     :
CLOS-ETTE TOO, L.L.C., CLOS-ETTE,    :
L.L.C., and MELANIE CHARLTON         :
FASCITELLI,                          :
                                     :
          Defendants.                :
- - - - - - - - - - - - - - - - - - -:
```
TO THE HONORABLE LEWIS A. KAPLAN, U.S.D.J.:

The plaintiff, Claire Allison, brings this action against Clos-ette Too, LLC ("C2") and Melanie Charlton Fascitelli ("Ms. Charlton") arising from an employment relationship. The plaintiff asserts that the defendants are liable for breach of contract or, in the alternative, quasi-contract, and for failure to pay Ms. Allison the minimum wage pursuant to the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (the "FLSA"), and New York Labor Law (the "NYLL").[1]

The parties now each move for an order granting summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure and oppose one another's motions. For the reasons that follow, I recommend that the plaintiff's motion be denied and that the defendants' motion be granted in part and denied in part.

---

[1] Ms. Allison originally asserted seventeen claims against C2, Clos-ette (C2's alleged parent company), and Ms. Charlton. The claims not listed above, including all claims against Clos-ette, were previously dismissed. Allison v. Clos-ette Too, LLC, No. 14 Civ. 1618, 2014 WL 4996358, at *1, *12 (S.D.N.Y. Sept. 15, 2014), rep. and rec. adopted, 2014 WL 5002099 (S.D.N.Y. Oct. 7, 2014).

1

Background[2]

Ms. Charlton is the creator and owner of Clos-ette, which designs and builds custom closets, and C2, which manufactures and sells hangers and other wardrobe organizational products. (Pl. 56.1, ¶¶ 1-3). In November 2011, Ms. Allison submitted an application in response to a posting on the New York University job website for a paid position at Clos-ette. (Pl. 56.1, ¶¶ 11-12). At the time, she was a full-time employee for Lone Star Funds ("Lone Star"), a private equity firm. (Def. 56.1, ¶ 2). Ms. Allison was interviewed by Ms. Charlton in March 2012. (Pl. 56.1, ¶ 13). Some time between the interview and May 4, 2012, the plaintiff began performing services for C2; the plaintiff contends that she began this work on March 16, 2012 (Pl. 56.1, ¶ 13), while the defendants insists that she began in April or May (Def. 56.1 Opp., ¶ 13). During this time, Ms. Allison continued to work at Lone Star. (Def. 56.1, ¶ 27). The plaintiff's responsibilities at C2 included drafting a company growth plan and creating a "teaser deck" to present to potential investors. (Pl. 56.1, ¶¶ 13-14; Def. 56.1, ¶¶ 9-11). In various investor documents, Ms. Allison was

---

[2] Because the parties have cross-moved for summary judgment, there are four factual statements before the court: Defendants' Local Rule 56.1 Statement of Undisputed Facts ("Def. 56.1"); Plaintiff's Response to Defendants' Statement of Undisputed Facts; Plaintiff's Statement of Undisputed Facts ("Pl. 56.1"); and Defendants' Local Rule 51.6(b) Statement of Material Facts in Response ("Def. 56.1 Opp."). Unless otherwise noted, a stand-alone citation of a 56.1 Statement denotes that I have deemed the underlying factual allegation undisputed. Any citations of a party's 56.1 Statement incorporates by reference the documents cited therein. Where necessary, however, I cite the underlying documents directly.

listed as "Head of Business Development" or "Director of Business Development."  (Pl. 56.1, ¶ 16).

The plaintiff asserts that she and Ms. Charlton first discussed in June 2012 the possibility that she would eventually receive a $200,000 annual salary and a ten percent ownership interest in C2 as compensation. (Pl. 56.1, ¶ 18). On September 6, 2012, Ms. Charlton stated in an e-mail to Ms. Allison, "I think 200k is too high with as large of [sic] equity piece as you're being given and vesting.  150k is much more in the range of comfortable for a start up and especially if you start in OCT. 200k is VERY high when you look at any comp." (Email from Melanie Fascitelli dated Sept. 6, 2012 ("Charlton 9/6/12 E-mail"), attached as part of Exh. 22 to Affirmation of Thomas M. Lancia dated Feb. 4, 2015 ("Lancia Aff.")).  That same day, Ms. Allison responded:

> We can discuss today, but that is over a 50% reduction from my current income.  I know I am substituting that with equity but given that the equity will be vested over a decent period of time, I think the salary I have requested is fair. . . .  As much as I do want to do this, and I have shown that I have, it has to make sense for me.

(E-mail from Claire Allison to Melanie Fascitelli dated Sept. 6, 2012, 11:33 AM ("Allison 9/6/12 E-mail I"), attached as part of Exh. 22 to Lancia Aff.).  She then stated in a follow-up e-mail:

> I'm not sure what happened between yesterday's agreement on terms and today.  I have been working since April on this and have continued to help out in every way I can. I expressed to you my asks months ago and am confused at why you are coming back with a new number now after I agreed to your stipulations on the vesting of equity.  I have been taking time off my current job to do this and am worried about taking off any more given this conversation.

3

(E-mail from Claire Allison to Melanie Fascitelli dated Sept. 6, 2012, 12:11 PM ("Allison 9/6/12 E-mail II"), attached as part of Exh. 22 to Lancia Aff.).

Ms. Allison did not receive any salary during her time at C2 (Pl. 56.1, ¶ 29), and inquired in November 2012 and January 2013 about when she would begin to be paid.  On November 13, Ms. Charlton responded to one of these inquiries: "every sale i am pushing for right now gets us to a place by jan i can fund you no matter!"  (E-mail from Melanie Charlton to Claire Allison dated Nov. 13, 2012, attached as part of Exh. 10 to Lancia Aff.; Pl. 56.1, ¶ 24).  On January 18, 2013, she responded to another, "When we receive first investor and/or bank debt worth your annual salary plus overlay of benefits I will start you at 150k salary . . . ." (E-mail from Melanie Charlton to Claire Allison dated Jan. 18, 2013, attached as Exh. 7 to Lancia Aff.; Pl. 56.1, ¶ 25).

In November 2012, Ms. Allison and Ms. Charlton negotiated the vesting schedule for Ms. Allison's equity, exchanging several drafts.  (Pl. 56.1, ¶ 20).  On November 30, 2012, the parties agreed by email that the plaintiff would be entitled to up to eight percent ownership of the company, subject to the following vesting schedule and terms:

(1) 3 points granted up front

- Vesting is in equal amounts on a quarterly basis

(2) 1 point granted, according to a cliff vest, upon 1 year anniversary with the company (starting when relationship started in May 2012)

(3) 2 points granted at the first of any of the following trigger events:

>              (a) Upon promotion to C title
>
>              (b) Upon 2 consecutive years during which the
>                  company achieves 10% incremental revenue
>                  growth
>
>              (c) Upon a corporate valuation, validated by an
>                  external capital raise, of $50MM or more USDs,
>                  granted at time of trigger with clawback
>                  option to the Company if employee leaves
>                  within 1 year after grant
>
>         (4) 2 points granted, upon a corporate valuation,
>             valuated by an external capital raise, of $250MM or
>             more USDs granted at time of trigger with clawback
>             option to the Company if employee leaves within 1
>             year after grant
>
>     *In all cases, if Employee voluntarily leaves the
>     Company, any unvested portion is forfeit [sic]
>
>     **If Employee involuntarily terminated without cause, all
>     non-valuation trigger vesting is accelerated and is
>     considered granted
>
>     ***If Employee is involuntarily terminated without cause
>     within 6 months of an external capital raise that is
>     equal to or above the $50m or $250m triggers, vesting is
>     accelerated and is considered granted

(Pl. 56.1, ¶ 21; Vesting Schedule, attached as part of Exh. 24 to Lancia Aff.).

In December 2012, Ms. Allison was terminated by Lone Star. (Def. 56.1, ¶ 28).

On April 4, 2013, Ms. Allison informed Ms. Charlton by e-mail that she could "no longer work for the company, and [would] limit [her] role to that of an equity holder," indicating that she understood three points of her equity to have vested. (Pl. 56.1, ¶ 26; E-mail from Claire Allison to Melanie Charlton dated April 4, 2013, attached as part of Exh. 4 to Lancia Aff.).

The plaintiff contends that she worked forty hours per week on

average for C2 over a fifty-five week period. (Pl. 56.1, ¶ 17). The defendants find this estimate implausible, but do not offer their own estimate. (Def. 56.1 Opp., ¶ 17).

Discussion

    A.   Summary Judgment Legal Standard

Under Rule 56 of the Federal Rules of Civil Procedure, a court will grant summary judgment if "the movant shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 322-323 (1986). The moving party bears the initial burden of identifying "the absence of a genuine issue of material fact." Celotex, 477 U.S. at 323. The opposing party then must come forward with specific materials establishing the existence of a genuine dispute. Id. Where the non-movant fails to make "a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial," summary judgment must be granted. Id. at 322.

In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Vann v. City of New York, 72 F.3d 1040, 1048-49 (2d Cir. 1995). However, the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party," Anderson, 477 U.S. at 249, and

may grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. Id. at 249-50. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (quoting First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288 (1968)). The same standard of review applies where, as here, the court is faced with cross-motions for summary judgment. See Lauria v. Heffernan, 607 F. Supp. 2d 403, 407 (E.D.N.Y. 2009). When evaluating cross-motions for summary judgment, the court reviews each party's motion on its own merits, and draws all reasonable inferences against the party whose motion is under consideration. Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001).

Rule 56 states that affidavits in support of or against summary judgment shall "set out facts that would be admissible in evidence." Fed. R. Civ. P. 56(c)(4). Accordingly, "only admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997). A party may not oppose a summary judgment motion on the basis of inadmissible evidence, unless the party can "show[] that admissible evidence will be available at trial." Burlington Coat Factory Warehouse Corp. v. Esprit De Corp., 769 F.2d 919, 924 (2d Cir. 1985); see also Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary

judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial.").

### B. Breach of Contract Claims

#### 1. Contract for Equity

The parties agree that, on November 30, 2012, Ms. Allison and Ms. Charlton entered into an enforceable agreement entitling the plaintiff to an ownership interest in C2 of up to eight percent, which would vest according to certain conditions. (Pl. 56.1, ¶¶ 20-21). Under the agreement, Ms. Allison was to receive (1) "3 points granted up front," which would vest "in equal amounts on a quarterly basis"; (2) an additional point upon her one-year anniversary with the company, "starting when the relationship started in May 2012"; (3) two points upon the first of several possible triggering events; and (4) two points upon a corporate valuation of $250 million or more. (Vesting Schedule). The agreement states that "all non-valuation trigger vesting is accelerated and considered granted" in the even that Ms. Allison is "involuntarily terminated without cause." (Vesting Schedule). The parties interpret the terms of the vesting schedule differently, and disagree on how much of Ms. Allison's equity had vested at the time of her departure from C2.

The plaintiff contends that she was entitled to six percent ownership under the agreement when she left C2. (Memorandum of Law in Support of Plaintiff's Motion for Summary Judgment ("Pl. PSJ Memo.") at 9). She understands the "3 points up front" to have vested at a rate of one point per quarter, "starting retroactively

six months prior to the agreement" in light of a November 27, 2012, e-mail in which Ms. Charlton said a "6 month look back on vesting . . . is fine." (Memorandum of Law in Further Support of Plaintiff's Motion for Summary Judgment ("Pl. PSJ Reply") at 2-3; Pl. PSJ Memo. at 9; E-mail from Melanie Charlton to Claire Allison dated Nov. 27, 2012, attached as part of Exh. 6 to Lancia Aff.). She therefore concludes that all three points had fully vested by March 2013. (Pl. PSJ Reply at 2-3). Despite the fact that her start date is defined in the vesting schedule as "May 2012," the plaintiff argues that she is entitled to the one-year anniversary point because a year had passed since her alleged actual start date of March 16, 2012. (Pl. PSJ Memo. at 9). Finally, the plaintiff argues that she is entitled to two points pursuant to the acceleration clause because, by refusing to pay Ms. Allison salary, Ms. Charlton constructively discharged her. (Pl. PSJ Memo. at 9).

The defendants challenge each of these assertions, arguing that Ms. Allison is entitled to no more than 0.25% under the agreed upon terms. (Memorandum of Law in Support of Defendants' Motion for Summary Judgment ("Def. DSJ Memo.") at 22-24). They contend, in light of a November 16, 2012, e-mail from Ms. Allison, that the "3 points up front" were intended to vest over a three-year period, at a rate of 0.25% per quarter; that the vesting schedule was not retroactive; and that therefore only a quarter of a point vested in the single quarter between November 30, 2012, and March 2013. (Def. DSJ Memo. at 22-23; E-mail from Claire Allison to Melanie Charlton dated Nov. 16, 2012, attached as part of Exh. K to Affirmation of

9

Michael P. Mangan dated Feb. 11, 2015). The defendants further argue that the plain text of the vesting schedule makes clear that Ms. Allison's one-year anniversary would occur in May 2013. (Def. DSJ Memo. at 23-24). Finally, they dispute the contention that Ms. Allison's working conditions were so intolerable that she was forced to resign. (Def. DSJ Memo. at 24).

The parties' positions regarding the terms of the vesting schedule implicate genuine disputes of material fact, including but not limited to the intent of the parties in agreeing to the "3 points up front" term. This term is ambiguous, as it states only that the points will vest in equal amounts on a quarterly basis without providing any indication of what those "equal amounts" will be. "To the extent that any of [an] agreement's terms may be ambiguous, indefinite or uncertain, it is well settled that extrinsic or parol evidence is admissible to determine their meaning." Scott-Macon Securities, Inc. v. Zoltek Companies, Inc., No. 06-2711-cv, 2007 WL 2914873, at *4 (2d Cir. Oct. 4, 2007) (alteration in original) (quoting Korff v. Corbett, 18 A.D.3d 248, 251, 794 N.Y.S.2d 374, 377 (1st Dep't 2005)). Because the parties disagree regarding both the intended meaning of the vesting schedule terms and which parol evidence should be consulted to resolve this issue, summary judgment should be denied to both parties as to how much equity is contractually owed to Ms. Allison.

    2. <u>Contract for Salary</u>

The parties disagree on the issue of whether an enforceable contract existed regarding Ms. Allison's salary. To recover for

10

breach of contract under New York law, a plaintiff must prove: (1) the existence of a contract, (2) the plaintiff's performance under the contract, (3) the defendant's breach of the contract, and (4) resulting damages. See First Investors Corp. v. Liberty Mutual Insurance Co., 152 F.3d 162, 168 (2d Cir. 1998); Palmetto Partners, L.P. v. AJW Qualified Partners, 83 A.D.3d 804, 806, 921 N.Y.S.2d 260, 264 (2d Dep't 2011). "To establish the existence of an enforceable agreement, the plaintiff must demonstrate 'an offer, acceptance of the offer, consideration, mutual assent, and an intent to be bound.'" Beautiful Jewelers Private Ltd. v. Tiffany & Co., No. 10-3039-cv, 2011 WL 4337108, at *1 (2d Cir. Sept. 16, 2011) (quoting Kowalchuck v. Stroup, 61 A.D.3d 118, 121, 873 N.Y.S.2d 43, 46 (1st Dep't 2009)).

Ms. Allison claims that she and Ms. Charlton agreed by e-mail on September 6, 2012, that she would be paid an annual salary of $150,000 beginning in October 2012. (Pl. PSJ Memo. at 10). In the cited e-mails, Ms. Charlton states: "I think 200k is too high with as large of equity piece as you're being given and vesting. 150k is much more in the range of comfortable for a start up and especially if you start in OCT." (Charlton 9/6/12 E-mail). Ms. Allison does not appear to agree to the salary in her response, but rather to continue the negotiation, stating among other things that "that is over a 50% reduction from [her] current income" and that she is "worried about taking off any more [time from her current job] given this conversation." (Allison 9/6/12 E-mail I; Allison 9/6/12 E-mail II). However, the plaintiff claims that she agreed

11

to a salary of $150,000, citing both this exchange and her own deposition testimony. (Pl. 56.1, ¶ 19). The defendants argue in response that "[t]here was never an agreement to pay salary to [Ms.] Allison," citing Ms. Charlton's deposition testimony without directly addressing the language of the September 6 e-mails. (Def. 56.1 Opp., ¶ 19). They contend that Ms. Allison's potential salary was always contingent on future fundraising, and that this understanding is supported by e-mails sent in January 2013, in which Ms. Allison asks Ms. Charlton "at what point of monthly revenue are you comfortable to start me on the payroll" and states that she is "trying to gauge when [she] will actually be able to receive a paycheck." (Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment at 11-12).

While the plaintiff has not provided sufficient evidence to support summary judgment in her favor regarding this issue, the defendants have also not foreclosed the possibility that an enforceable agreement existed regarding Ms. Allison's salary. Because there is a genuine dispute regarding whether such agreement existed and, if so, its terms, summary judgment should be denied to both parties.

    D.    <u>Quasi-Contract Claims</u>

As an alternative to her contract claims, the plaintiff asserts that the defendants are liable under several quasi-contract theories -- quantum meruit, unjust enrichment, and implied contract -- and seeks summary judgment on that basis as well. In their cross-motion for summary judgment, the defendants argue that Ms.

12

Allison's quasi-contract claims are duplicative of her contract claims and not permitted in light of the undisputed existence of an enforceable contract for equity. (Def. DSJ Memo. at 24-25).

### 1. Equity

Under New York law, quasi-contract claims "generally exist only where there is no express agreement between the parties." D'Amato v. Five Star Reporting, Inc., __ F. Supp. 3d __, __, 2015 WL 248612, at *23 (E.D.N.Y. 2015); see also Valley Juice Ltd. v. Evian Waters of France, Inc., 87 F.3d 604, 610 (2d Cir. 1996) ("Under New York law, the existence of a valid and enforceable written contract governing a particular subject matter ordinarily precludes recovery in quasi contract for events arising out of the same subject matter" (internal quotation marks and brackets omitted)).

The parties agree that the November 30, 2012, vesting schedule governs the plaintiff's entitlement to equity in C2; thus, her quasi-contract claims regarding equity arise out of that agreement. (Pl. 56.1, ¶ 21). Under such circumstances, Ms. Allison's quasi-contract claims for equity must fail as a matter of law. See, e.g., Klein v. Torrey Point Group, LLC, 979 F. Supp. 2d 417, 434 (S.D.N.Y. 2013) ("Since the parties contracted in the Offer Letter regarding the basis for commission payments, Plaintiff's quantum meruit claim cannot survive."). Accordingly, I recommend that the plaintiff's motion be denied and that summary judgment be granted to the defendant with respect to Ms. Allison's quasi-contract claims regarding equity.

       2.   <u>Salary</u>

However, because the defendants do not concede the existence of an enforceable contract for salary, summary judgment is not appropriate with regard to the salary-based quasi-contract claims. "[A] party is not precluded from proceeding on both breach of contract and quasi-contract theories where . . . the contract does not cover the dispute in issue." <u>Curtis Properties. Corp. v. Greif Cos.</u>, 236 A.D.2d 237, 239, 653 N.Y.S.2d 569, 571 (1st Dep't 1997); <u>see also</u> <u>Mid-Hudson Catskill Rural Migrant Ministry, Inc. v. Fine Host Corp.</u>, 418 F.3d 168, 175 (2d Cir. 2005) ("[A] valid contract bars a quantum meruit action only where the scope of the contract clearly covers the dispute between the parties." (internal quotation marks and brackets omitted)). For example, "recovery in quasi-contract outside the existing contract may be had if a party has rendered additional services upon extra-contractual representations by the other party." <u>U.S. East Telecommunications, Inc. v. U.S. West Communications Services, Inc.</u>, 38 F.3d 1289, 1298 (2d Cir. 1994).

There is significant evidence that suggests that both Ms. Allison and Ms. Charlton understood the negotiations regarding the plaintiff's potential equity to be independent from negotiations regarding her salary, including the January 2013 salary e-mails (which, of course, were exchanged after the November 30, 2012 vesting schedule was agreed to). Furthermore, as the plaintiff points out, the November 30 vesting schedule cannot be construed to preclude quasi-contract claims regarding salary Ms. Allison claims

14

was owed to her for work performed <u>before</u> November 30, 2012. (Pl. PSJ Reply at 7-8). As Ms. Allison claims that she was contractually or quasi-contractually owed salary beginning in October 2012, her quasi-contract claims regarding salary are not legally barred. Because this claim involves disputes of material fact, including whether Ms. Allison had a genuine expectation of salary beginning in October 2012 (Pl. 56.1, ¶¶ 19, 24), I recommend that summary judgment be denied to both parties.

  E. <u>Minimum Wage Claims</u>

  Finally, the plaintiff argues that she is owed the minimum wage under both federal and New York law for the period from March 16, 2012, through April 4, 2013, during which time she estimates she worked an average of forty hours per week. (Pl. 56.1, ¶ 17). The defendants argue that they are entitled to summary judgment on this issue because the minimum wage laws do not apply to Ms. Allison and because she has not sufficiently computed her hours or damages.

    1. <u>Fair Labor Standards Act</u>

  The FLSA provides that "[e]very employer shall pay to each of his employees" a statutorily prescribed minimum wage of $7.25. 29 U.S.C. § 206(a). An employer who fails to pay the minimum wage to an employee may be held liable for both the amount of unpaid wages and an additional equal amount in liquidated damages. 29 U.S.C. § 216(b). In order to establish a violation of the FLSA, a plaintiff must first show that she is a "covered employee[]," who was "'employed in an enterprise engaged in interstate commerce or in

the production of goods for interstate commerce.'"  Rodriguez v. Almighty Cleaning, Inc., 784 F. Supp. 2d 114, 120 (E.D.N.Y. 2011) (quoting Shim v. Millennium Group, No. 08 CV 4022, 2009 WL 211367, at *2 (E.D.N.Y. Jan. 28, 2009)); see also 29 U.S.C. §§ 206(a), 207(a).  To determine if a worker is an independent contractor or an employee under the FLSA, the Second Circuit looks to the following "economic reality" factors:

> (1) the degree of control exercised by the employer over the workers, (2) the workers' opportunity for profit or loss and their investment in the business, (3) the degree of skill and independent initiative required to perform the work, (4) the permanence or duration of the working relationship, and (5) the extent to which the work is an integral part of the employer's business.

Barfield v. New York City Health and Hospitals Corp., 537 F.3d 132, 142 (2d Cir. 2008) (quoting Brock v. Superior Care, Inc., 840 F.2d 1054, 1058-59 (2d Cir. 1988)); accord Hart v. Rick's Cabaret International, Inc., 967 F. Supp. 2d 901, 912 (S.D.N.Y. 2013).  No one factor is dispositive and analysis focuses on the totality of the circumstances of the alleged employer/employee relationship.  See id.  The goal of the economic realities test "is to determine whether the employee[] in question [is] economically dependent upon the putative employer."  Lopez v. Silverman, 14 F. Supp. 2d 405, 414 (S.D.N.Y. 1998).

There are genuine disputes of fact material to most of the Barfield factors, precluding summary judgment on this issue.  With regard to the second Barfield factor, the plaintiff argues that she did not invest any money in C2, while Ms. Charlton did "and is the only individual to profit from the company's improving

16

performance." (Pl. PSJ Memo. at 16). This position appears to be at odds with Ms. Allison's contention that she is entitled to equity that began to vest in June 2012. However, because the parties dispute whether the November 30, 2012 agreement included retroactive vesting or not, the question of whether Ms. Allison had an opportunity for profit or loss during the June to November 2012 period is open.

While the parties agree that Ms. Allison was free to set her own hours (Def. 56.1, ¶ 16), they dispute the level of substantive control exercised by Ms. Charlton over Ms. Allison's daily work. The plaintiff contends that she only performed work "assigned . . . or explicitly approved by" Ms. Charlton (Pl. 56.1, ¶ 15), while the defendants maintain that this would not have been possible given that Ms. Charlton lacks "developed skills in finance, marketing and private equity, and [therefore] could not give [Ms.] Allison specific instructions [regarding] these tasks" (Def. 56.1 Opp., ¶ 15; Def. 56.1, ¶¶ 14-15). This dispute is material to the third <u>Barfield</u> factor.

The parties also dispute the permanence of Ms. Allison's relationship with C2. The defendants argue that the relationship was transient, pointing to the fact that she sought to protect her position at Lone Star by, for example, preventing her name from appearing on publicly disclosed C2 documents. (Def. DSJ Memo. at 13). The plaintiff counters that she was working roughly forty hours per week, making the position essentially full-time, and that the job was always intended to be a full-time, long-term one,

citing the job posting. (Pl. PSJ Memo. at 17-18). The fact that the vesting schedule for Ms. Allison's equity was intended to incentivize her to remain with the company for a substantial duration cuts both ways; while it may be interpreted to show that both parties intended the relationship to be long-term, the defendants argue that it evinces Ms. Charlton's concern that Ms. Allison would "leave prematurely." (Def. DSJ Memo. at 13). The fourth Barfield factor is therefore also dependent on disputed facts.

Accordingly, I recommend that summary judgment be denied to both parties with respect to Ms. Allison's FLSA claim.

    2.  New York Labor Law

Under the NYLL, the "critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." Bynog v. Cipriani Group, Inc., 1 N.Y.3d 193, 198, 770 N.Y.S.2d 692, 694-95. New York courts look at several factors, including whether the worker "(1) worked at [her] own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." Id. at 198-99, 770 N.Y.S.2d at 695. Despite these different tests, courts tend to arrive at the same result regarding the existence of an employment relationship under both the FLSA and the NYLL. Hart, 967 F. Supp. 2d at 924. In light of the same factual disputes discussed above, I recommend that summary judgment be denied with respect to Ms.

Allison's NYLL claim.

Conclusion

For the foregoing reasons, I recommend that the plaintiff's motion (Docket no. 109) be denied, that the defendant's motion (Docket no. 113) be granted with respect to the plaintiff's quasi-contract claim regarding equity, and that the remainder of the defendant's motion be denied.

Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(d) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from this date to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Lewis A. Kaplan, Room 2240, and to the chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       April 20, 2015

Copies mailed this date to:

Thomas M. Lancia, Esq.
Thomas M. Lancia PLLC
22 Cortlandt St., 16th Floor
New York, NY 10007

Michael P. Mangan, Esq.
Mangan Ginsburg LLP
80 Maiden Lane, Suite 509
New York, NY 10038